# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| CLYVE SHAW and KENARDRO PRESS, on behalf themselves and those similarly situated,<br><br>Plaintiffs,<br><br>- against -<br><br>HORNBLOWER CRUISES & EVENTS, LLC,<br><br>Defendant. | Case No.: 21-cv-10408-VM-OTW |

### DECLARATION OF BRENDAN SWEENEY IN SUPPORT OF PLAINTIFFS' UNOPPOSED MOTION FOR FINAL APPROVAL OF CLASS ACTION SETTLEMENT

I, Brendan Sweeney, pursuant to 28 U.S.C. § 1746, declare under penalty of perjury as follows:

1. I am an attorney admitted to practice in the State of New York and in this court. I am a Partner at The Law Office of Christopher Q. Davis PLLC (the "Davis Firm"), counsel for Plaintiffs in the above-captioned matter. As such, I am fully familiar with the facts and circumstances stated herein.

2. The Davis Firm is based in New York City and focuses on representing plaintiffs in a wide variety of employment matters, including individual and class action litigation, wage and hour and discrimination claims, as well as contract and severance negotiations.

3. I am one of the lawyers primarily responsible for prosecuting Plaintiffs' claims on behalf of the proposed class.

4. I make these statements based on personal knowledge and would so testify if called as a witness at trial.

5.      I submit this Declaration in Support of Plaintiffs' Unopposed Motion for Final Approval of Class Action Settlement ("Motion for Final Approval").  All defined terms contained herein shall have the same meanings as set forth in the Settlement Agreement, executed on or about September 6, 2023, and attached hereto as **Exhibit 1**.

6.      After the Court granted preliminary approval of this settlement, Class Counsel and Defendant's Counsel worked with the designated claims administrator, RG/2 Claims Administration ("RG/2" or the "Claims Administrator"), to issue the court-approved Notice and Claim Form to the 462 members of the NY Subclass and the 445 members of the CHI-SF Subclass.

7.      **Exhibit 2** is the Declaration of Tina Chiango of RG/2. RG/2 has received 224 Claim Forms. Of these, 219 were received or postmarked by December 26, 2023, and represent $636,135.44 in estimated payments. Five (5) Claim Forms were postmarked after December 26, 2023 and represent $16,971.19 in estimated payments.  Defendant agreed not to object to the late claims. If If the Court approves the settlement, Defendant will fund the QSF in the amount of $1,785,544.10.  This amount will be allocated as follows:

| | |
|---|---|
| Authorized NY Claimants: | $653,106.63 |
| CHI-SF Class Members: | $235,918.17 |
| Reserve fund | $20,0000.00 |
| Service Awards: | $30,000.00 |
| Attorneys' Fees: | $800,000.00 |
| Class Counsel Expenses: | $23,963.30 |
| Admin. Fees: | $22,556.00 |
| Total: | $1,785,544.10 |

**Procedural History**

8. On December 6, 2021, Plaintiff Clyve Shaw ("Shaw"), on behalf of himself and other similarly situated individuals who worked for Defendant Hornblower Cruises & Events LLC ("Hornblower" or "Defendant"), filed a Class Action Complaint against Hornblower. *See* ECF No. 1.

9. The original Complaint alleged that Hornblower implemented a "mass layoff" in New York and failed to provide advance notice as required by the Workers Adjustment and Retraining Notification Act, 29 U.S.C. §§ 2101 et seq. (the "WARN Act"), and the New York State Worker Adjustment and Retraining Notification Act. This matter is referred to herein as "this Litigation."

10. On March 4, 2022, Plaintiff Shaw and Kenardro Press ("Press") filed an Amended Complaint that added claims under the Illinois WARN Act 820 Ill. Comp. Stat. Ann. 65/1, *et seq.*, (the federal, New York and Illinois WARN Acts are referred to collectively as the "WARN Acts") and alleged that Hornblower was liable for implementing mass layoffs without required notice in New York, Chicago, San Francisco and other locations.

11. In accordance with the Court's Individual Rules, Defendants submitted a number of letters challenging the sufficiency of the pleadings. On April 22, 2022, Defendant sought partial dismissal of the Second Amended Complaint or preemptive denial of class certification. Defendant's argument for dismissal was that certain claims were pleaded in conclusory fashion and its argument regarding certification was that the Named Plaintiffs could not represent class members at worksites where they had not worked. Plaintiffs opposed this Motion. The Court granted Defendant's Motion for partial dismissal and denied Defendant's Motion with respect to preemptive denial of class certification in an Order dated November 7, 2022. Plaintiffs filed a

3

Third Amended Complaint on November 14, 2022. On November 28, 2022, Defendant moved for partial dismissal of the Third Amended Complaint, which Plaintiffs opposed. This Motion was denied in an Order dated May 31, 2023.

12. The parties exchanged written discovery requests and negotiated a protocol to locate relevant Electronically Stored Information ("ESI"). Hornblower produced more than 12,000 pages of documents and ESI. Hornblower also provided a thorough privilege log and several sets of detailed data. Plaintiffs' counsel analyzed the documents, privilege log and data produced by Hornblower to assess liability and construct a model of potential damages.

13. The parties then agreed to mediation with Martin F. Scheinman. Prior to the mediation, the parties engaged in extensive negotiations regarding discovery and their positions on issues in dispute. As part of the mediation process, the parties agreed to exchange detailed briefs to fully explain their positions on both factual and legal issues.

14. The parties participated in a full day mediation session on March 27, 2023, which did not result in a settlement. After the first session, the parties agreed to exchange additional information and continue to negotiate. The parties participated in two additional full day mediation sessions, on May 15 and July 20, 2023, which resulted in the proposed settlement.

15. The parties were ultimately successful in reaching an agreement during the mediation that was shortly thereafter memorialized in a signed term sheet between the parties.

**Overview of Investigation and Discovery**

16. Class Counsel has conducted a thorough investigation into the merits of the potential claims and defenses in this Litigation.

17. Class Counsel focused their investigation and legal research on the underlying merits of the Plaintiffs' claims, the damages to which they are entitled, and the propriety of proceeding on a class-wide basis.

18. Class Counsel conducted interviews with each of the Named Plaintiffs to determine the circumstances of their terminations and the notice they received before they were furloughed and then permanently terminated.

19. Hornblower is a marine hospitality provider that offers services including cruises, on-board dining experiences, sightseeing, and ferry and water transportation services and operating in multiple work sites including New York, New York (Pier 62); Chicago, Illinois (Navy Pier); and San Francisco, California (the "Relevant Work Sites"). Hornblower provided data to Class Counsel that confirmed that 462 full-time and part-time employees who worked at Pier 62 in New York City were either furloughed (and not recalled) or terminated between June 12, 2020, and September 9, 2020, and were not given a minimum of 90 days' written notice of termination (the "NY Subclass").

20. Hornblower provided data to Class Counsel that confirmed that a total of 445 full-time and part-time employees were either: (1) employed at Hornblower's Chicago location and experienced an employment loss between June 28, 2020, and September 25, 2020; or (2) employed at Hornblower's San Francisco location and experienced an employment loss between May 29, 2020, and August 26, 2020, and were not given a minimum of 60 days' written notice of termination (the "CHI-SF Subclass").

21. The parties did not dispute the fact that more than fifty full-time employees who were employed at Hornblower's New York City worksite experienced an "employment loss" that potentially triggered WARN Act obligations. Whether Hornblower was liable to the NY

Subclass, however, depended on the applicability of two affirmative defenses. The WARN Acts provide that an employer is completely relieved of its obligation to provide WARN notice where a mass layoff is caused by "any form of natural disaster." *See* 29 U.S.C. § 2102(b)(2)(B); N.Y. Lab. Law § 860-c. Courts have reached conflicting conclusions as to whether the "natural disaster" defense is applicable to layoffs related to COVID-19.

22. Hornblower also asserted that its liability would have been eliminated or limited by the Unforeseeable Business Circumstances Defense. Where a mass layoff event is caused by business circumstances that were not reasonably foreseeable at the time notice would have been required, employers are only required to give as much notice as is practicable under the circumstances under the federal, New York, and Illinois WARN Acts. *See* 29 U.S.C. § 2102(b)(2)(A); N.Y. Lab. Law § 860-c; 820 Ill. Comp. Stat. 65/15(a)(2); 20 C.F.R. § 639.9(b).

23. Plaintiffs' counsel devoted very substantial amounts of time and resources to conducting a review Hornblower's ESI and communications to discover evidence as to when it knew or should have known that the furloughs it implemented in March 2020 would last longer than 180 days, and when it knew or should have known that it would implement permanent terminations later in 2020. Plaintiffs also conducted significant research in external sources (i.e., government restrictions on in-person gatherings, news reports, etc.) to support their argument that a reasonable employer in Hornblower's position should have foreseen the lengthy layoffs and terminations more than sixty days before they were implemented.

24. In light of the unique challenges presented by the COVID-19 pandemic, whether lengthy layoffs were foreseeable in the Summer of 2020, and whether the notices that Hornblower provided amounted to "as much notice as [was] practicable under the circumstances," would have been hotly disputed factual issues.

25. The Natural Disaster and Unforeseeable Business Circumstances defenses were potentially applicable to all of the Relevant Worksites.

26. In addition to these defenses, Hornblower took the position that the WARN Act was not triggered by its actions in San Francisco because its layoff impacted less than fifty full-time employees in any ninety-day period. Hornblower took the position that only forty-six full-time employees were impacted. Plaintiffs analyzed Hornblower's data and concluded that fifty-eight full-time employees were impacted, including sixteen who were impacted by a reduction in hours over a six-month period. Whether the group that was impacted by a reduction in hours could be aggregated with individuals who were laid off in the same ninety-day period was a disputed issue.

27. With respect to Chicago, Defendant disputed that WARN was triggered because they argued that less than 33% of the full-time employees at the site experienced an employment loss during any 90-day period. Defendant also took the position that they were not liable because the layoffs resulted from the closing of Navy Pier by the government of the City of Chicago. Relying on *Hotel Employees Local 54 v. Elsinore Shore*, 173 F.3d 175, 187 (3d Cir. 1999), and similar decisions, Defendant took the position that they were not liable because the closure was out of their control. Plaintiffs took the position that Hornblower's obligation to provide WARN notices was triggered before the government closure because the permanent layoffs were foreseeable.

28. Class Counsel conducted extensive legal research on matters such as class certification standards and risk, factually similar cases, summary judgment risks, risks attendant to WARN Act litigation, and class-wide damages.

**Settlement Negotiations**

29. Class Counsel prepared for the March 27, 2023, mediation by researching and drafting a detailed mediation statement. Class Counsel reviewed and selected documentary evidence for presentation at mediation, reviewed the data and performed a class wide calculation of damages, and formulated a mediation demand.

30. In advance of the mediation, the parties each submitted detailed mediation statements to the mediator setting forth an overview of the legal and factual landscape of the case. The parties agreed to exchange substantial portions of these statements.

31. During the mediation, the parties then presented their assessments of the case and discussed the merits of each parties' positions.

32. The parties remained far apart on the terms of an appropriate settlement after the first mediation session. But the parties agreed to exchange additional data and continue negotiating.

33. The parties engaged in another full day mediation session on May 15, 2023. Again, the mediation session did not result in an agreement, but the parties again agreed to exchange information regarding topics that remained in dispute and agreed to continue negotiating.

34. The parties engaged in a third full day mediation session on July 20, 2023, and ultimately reached an agreement as to the resolution of the claims for Named Plaintiffs and the putative Class in this Litigation, the terms of which are set forth in the Settlement Agreement. *See* Ex. 1.

35. Hornblower agreed to pay a maximum of $2,000,000.00 to settle the claims of the NY Subclass. If Hornblower was found liable for failing to provide notice to the NY Subclass and owed damages for the maximum sixty-day period, Plaintiffs estimated liability, before

interest and attorneys' fees, would have been $1,415,948. The proposed Settlement will make approximately $1,275,000 available for the NY Subclass to claim (after attorneys' fees and costs).

36. Class Counsel agreed to a "claims made" settlement for the NY Subclass because the amounts available to NY Subclass Members are substantial, relative to their maximum potential recovery under the WARN Acts.

37. Hornblower agreed to pay $400,000.00 to settle the claims of the CHI-SF Subclass. If Hornblower was found liable for failing to provide notice to the CHI-SF Subclass and owed damages for the maximum sixty-day period, Plaintiffs estimated liability, before interest and attorneys' fees, would have been $1,380,200.00. The proposed Settlement will pay approximately $242,000 to members of the CHI-SF Subclass (after attorneys' fees and costs).

38. Class Counsel agreed to settle the claims of the CHI-SF Subclass for this amount because of the potentially significant risks presented by Hornblower's defenses to these claims.

39. In Class Counsel's estimation and weighed in light of the attendant risks presented by litigating this matter further, the settlement reached represents a meaningful recovery of a substantial portion of the notice pay that the Plaintiffs and the class could have obtained had they achieved class certification, prevailed on all of their claims at trial and survived an appeal.

40. At all times during the settlement negotiation process, negotiations were conducted on an arm's-length basis.

**The NY Subclass Settlement Fund and Settlement Notices**

41. Hornblower agreed to pay a maximum of $2,000,000.00 to settle the claims of the NY Subclass, which covers payments to NY Subclass Members who submit a claim form, a

service payment to Named Plaintiff Shaw, Court-approved attorneys' fees and costs, and court approved Claims Administration costs. Ex. 1 at Section 3.

42. The Court approved a Notice to NY Subclass Members as part of the preliminary approval process.

43. New York subclass members were required to return a Claim Form.

44. In the event any portion of the Net NY Settlement Amount is not paid to the NY Subclass Members, such amount shall be retained by Defendant. *Id.* at ¶ 3.1(C).

**Releases**

45. NY Subclass Members who do not timely and validly submit an Opt-Out Statement (in accordance with Section 2.5 of the Settlement Agreement) will release Defendant from any and all claims based on or arising under the federal Worker Adjustment and Retraining Notification ("WARN") Act, 29 U.S.C. § 2101 et seq., and the New York Labor Law, that could have been brought against the Released Parties, relating back to the full extent of the applicable statutes of limitations and continuing through the date of the Court's final approval of the settlement agreement *Id.* at ¶¶ 1.30, 2.5(D).

**Allocation Formula**

46. Each NY Subclass Member who does not submit an Opt-Out Statement will be eligible to submit a Claim Form to receive a share of the Net NY Settlement Amount.

47. Each NY Subclass Member's share will be proportional to their "Average Weekly Earnings" during weeks that the individual actually worked during the twenty-four week period that ended on March 27, 2020. *Id.* at ¶ 3.6.

**Attorneys' Fees, Costs, Service Payments and Administration Fees**

48. With respect to the settlement for the NY Subclass, Plaintiffs will apply for Six

Hundred Sixty-Six Thousand Six Hundred Sixty-Seven Dollars and Zero Cents ($666.667.00), which represents one third of the New York Settlement Fund, for attorneys' fees in this action. *Id.* at ¶ 3.3.

49. Class Counsel will also ask the Court to grant them reimbursement for costs expended on behalf of the Class. *Id.*

50. Plaintiffs are submitting an application for attorneys' fees and costs simultaneously with their Motion for Final Approval of the Settlement. *Id.*

51. The Administrator's fees and costs for administering the global settlement were $22,556.00. The Settlement Agreement provides that these fees and costs will be paid from the QSF.

52. In addition to his individualized award under the allocation formula, Named Plaintiff Shaw will apply for a Service Payment as recognition of the services he rendered on behalf of the Class. Named Plaintiff Shaw will apply to receive no more than twenty-five thousand dollars ($25,000) as a service award. *Id.* at ¶¶ 3.5.

53. Named Plaintiff Shaw originally brought the facts to the attention of counsel, provided counsel with relevant documents and participated in the drafting of the initial complaint, and he attended all three mediation sessions.

54. Service awards of this type are commonly awarded in complex litigation. The Court need not rule on the proposed service awards now.

55. The Named Plaintiffs will move for Court approval of the service awards simultaneously with the Plaintiffs' motion for final approval of the settlement.

**The CHI-SF Subclass Settlement Fund and Settlement Notices**

56. Hornblower agreed to pay a maximum of $400,000.00 to settle the claims of the

CHI-SF Subclass Members, which covers payments to CHI-SF Subclass Members who do not opt-out, a service payment to Named Plaintiff Press, Court-approved attorneys' fees and costs, and court approved Claims Administration costs.

57. The court approved a Notice to CHI-SF Subclass Members as part of the preliminary approval process.

58. In order to receive a payment from the Net CHI-SF Settlement Amount, a CHI-SF Subclass Member does not need to do anything. *Id.*

59. In the event any portion of the Net CHI-SF Settlement Amount is not paid to the CHI-SF Subclass Members, such amount shall be retained by Defendant. *Id.* at ¶ 4.4.

**Releases**

60. CHI-SF Subclass Members who did not submit an Opt-Out Statement in accordance with Section 2.5 of the Settlement Agreement will release Defendant from any and all claims based on or arising under the federal WARN Act, the Illinois Business and Employment Law, and the California Labor Code that could have been brought against the Released Parties, relating back to the full extent of the applicable statutes of limitations and continuing through the date of the Court's final approval of the settlement agreement *Id.* at ¶¶ 1.30, 2.5(D).

**Allocation Formula**

61. Each CHI-SF Subclass Member who does not submit an Opt-Out Statement will receive a share of the Net CHI-SF Settlement Amount.

62. Each CHI-SF Subclass Member's share will be proportional to their "Average Weekly Earnings" during weeks that the individual actually worked during the twenty-four week period that ended on March 27, 2020. *Id.* at ¶ 4.8.

### Attorneys' Fees, Costs, Service Payments and Administration Fees

63. With respect to the CHI-SF subclass settlement, Class Counsel will apply for One Hundred Thirty-Three Thousand Three Hundred Thirty-Three Dollars and Zero Cents ($133,333.00), which represents one third of the CHI-SF Settlement Fund, for attorneys' fees in this action. *Id.* at ¶ 4.5.

64. Class Counsel will also ask the Court to grant them reimbursement for costs expended on behalf of the CHI-SF Subclass. *Id.*

65. The Administrator's fees and costs for administering the global settlement were $22,556.00. The Settlement Agreement provides that these fees and costs will be paid from the QSF. *Id.* at ¶ 2.2(B).

66. In addition to his individualized award under the allocation formula, Named Plaintiff Press will apply for a Service Payment as recognition of the services he rendered on behalf of the CHI-SF subclass. Named Plaintiff Press will apply to receive no more than five thousand dollars ($5,000) as a service award. *Id.* at ¶¶ 3.5.

67. Named Plaintiff Press brought facts to the attention of counsel, provided counsel with relevant documents and participated in the drafting of the Amended Complaint.

68. Service awards of this type are commonly awarded in complex litigation. The Court need not rule on the proposed service awards now.

69. The Named Plaintiffs will move for Court approval of the service awards simultaneously with the Plaintiffs' motion for final approval of the settlement.

### Information on Claims Administrator

70. RG/2 is a full-service legal settlement administration firm with experience on thousands of settlement administration projects.

71. RG/2 is very experienced in settlement administration related to employment law.

72. Notably, Class Counsel has used RG/2 for settlement administration of complex wage and hour class and collective actions in the past and found them to be reliable, experienced, and cost-efficient.

73. Neither side has any experience or relationship with RG/2 outside the settlement or notice administration context.

74. Counsel for both parties believe that RG/2's fee of $22,556.00 to establish the QSF, administer notice, manage receipt of Claim Forms and issue checks is fair and reasonable given the size of the class and the services required.

Dated: February 9, 2024

Respectfully Submitted,

_____
Brendan Sweeney
**The Law Office of Christopher Q. Davis**
80 Broad Street, Suite 703
New York, New York 10004
